FILED
U.S. DIST. COURT
MIDDLE DIST. OF LA

2008 JUL 10 P 2: 24

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

## SUPERSEDING INDICTMENT FOR CONSPIRACY, RECEIPT AND POSSESSION OF STOLEN TRADE SECRETS, WIRE FRAUD, ILLEGAL MONETARY TRANSACTIONS, PERJURY, AND ASSET FORFEITURE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 05-85-RET-CN |
| | : | |
| | : | 18 U.S.C. § 1832(a)(5) |
| versus | : | 18 U.S.C. § 1832(a)(3) |
| | : | 18 U.S.C. § 1343 |
| | : | 18 U.S.C. § 1957 |
| | : | 18 U.S.C. § 1623 |
| WEN CHYU LIU, a/k/a | : | 18 U.S.C. § 1834 |
| DAVID W. LIOU | : | 18 U.S.C. § 2 |

## THE GRAND JURY CHARGES:

### COUNT ONE - CONSPIRACY

**At all times relevant to this Count:**

**The Product: Tyrin® CPE**

1.      The Dow Chemical Company ("Dow") was a global science and technology based company that had developed, among other products, an elastomeric (rubber-like) brand of chlorinated polyethylene polymer (CPE), called "Tyrin® CPE." Tyrin® CPE was used in a number of applications worldwide, such as automotive and industrial hoses, electrical cable jackets, vinyl siding, and window profiles. Tyrin® CPE was produced for, and placed in, interstate and foreign commerce.


RET(2)

2.     Dow's Tyrin® CPE was manufactured at Dow facilities in Stade, Germany, and Plaquemine, Louisiana.

3.     Dow refined its Tyrin® CPE development and manufacturing technology over the years at substantial cost. Dow took reasonable measures to keep secret its scientific, technical, economic and engineering information regarding Tyrin® CPE, and such information derived independent economic value from not being generally known and not being readily ascertainable by the public through proper means. Such measures included:

a.     Employment and retirement agreements, requiring non-disclosure of trade secrets and confidential information, without written permission of Dow;

b.     advising and educating employees to maintain secrecy and confidentiality of trade secrets and confidential information;

c.     limiting access to research, development and engineering departments to those employees concerned with the operation of such departments;

d.     requiring visitors to sign in before being admitted to manufacturing and laboratory facilities and requiring visitors be accompanied by authorized personnel;

e.     requiring consultants and vendors to sign confidentiality agreements regarding trade secret and confidential information;

f.     marking documentary materials with notices of confidentiality;

g.     advising and instructing employees leaving Dow not to take or thereafter use or disclose trade secrets; and

h.     maintaining perimeter security including protective fencing, manned gates, and roving security guards.

4.     On April 1, 1996, Dow transferred its assets for production and sale of Tyrin® CPE to DuPont Dow Elastomers, L.L.C. ("DuPont Dow"). DuPont Dow was a joint venture

2

between Dow and E.I. duPont de Nemours & Company. Dow retained ownership of its trade secrets, confidential information, and proprietary information concerning Tyrin® CPE, licensing the same only to DuPont Dow. From April 1, 1996, until July 1, 2005, DuPont Dow was the only company licensed by Dow to use the trade secret, confidential, and proprietary information to make and sell Tyrin® CPE.

**The Principal Participants**

5.      Defendant **WEN CHYU LIU**, also known as **DAVID W. LIOU** (hereafter referred to as **LIOU**), worked for Dow from 1965 until he retired on or about March 31, 1992. During his career with Dow, **LIOU** worked in research and development on various aspects of the development and manufacture of Dow's elastomers, including Tyrin® CPE. Prior to his retirement, **LIOU** and his wife formed a company in Baton Rouge called Pacific Richland Products, Inc. ("Pacific Richland"). **LIOU** intended to create marketable, chemical engineering design packages for interested companies, including those in the People's Republic of China.

6.      John Wheeler was a former Dow employee who had retired on or about March 31, 1994. During his career with Dow, Wheeler had assisted in the design, construction, and start-up of the Stade, Germany, facility for the manufacture of Tyrin® CPE in the 1980s, and had utilized his knowledge from the Stade venture to help modify and modernize the older Tyrin® CPE production facility in Plaquemine, Louisiana, in the late 1980s and early 1990s. Because of Wheeler's extensive knowledge about Tyrin® CPE, **LIOU** hired Wheeler some

time in 1996 to assist **LIOU** and Pacific Richland in creating a marketable process design package for the manufacture of CPE.

7.      HM, a citizen of Germany, was a former Dow employee in Germany who had retired on or about June 30, 1997 after extensive work at the Stade plant.  HM assisted **LIOU**, Wheeler, and several Chinese engineers in performing detailed engineering work, including heat and material balances and piping and instrumentation drawings (P&IDs) for the Pacific Richland design package for manufacturing CPE.

8.      Keith Stoecker was a chemical engineer and an employee of Dow at the Plaquemine facility from 1988 until his termination on September 20, 1999.  Stoecker was the senior engineer on one of the Tyrin® CPE production lines or "trains."  He had access to Dow trade secrets, confidential, and proprietary information regarding the development and manufacture of Dow elastomers, including Tyrin® CPE.  Stoecker provided technical assistance for the China projects, including production of a process manual for CPE production to be included in the Pacific Richland design packages.  Stoecker produced the process manual by downloading the Dow Plaquemine Tyrin® CPE process manual from his Dow work computer to his home computer, and modifying it both on his home computer and on computers at Pacific Richland to apply to production for the Chinese companies.

9.      **LIOU**, Wheeler, Stoecker, and HM had all signed employment agreements and retirement agreements with Dow, prohibiting their ability to disclose Dow's trade secrets and other confidential information, without written permission of Dow.

**The Conspiracy and its Objects**

10.     Beginning on an unknown date and continuing until at least October 31, 2001, in the Middle District of Louisiana and elsewhere, defendant **DAVID W. LIOU,** with intent to convert trade secrets that were related to and included in a product produced for and placed in interstate and foreign commerce, to the economic benefit of someone other than the owner of those trade secrets, and intending and knowing the offenses would injure the owner of those trade secrets, knowingly conspired with others, both known and unknown, including Wheeler, HM, and Stoecker, to:

(a) steal, without authorization appropriate, and obtain by fraud, artifice, and deception Dow's Tyrin® CPE trade secrets in violation of Title 18, United States Code, Section 1832(a)(1);

(b) without authorization copy, duplicate, draw, photograph, download, upload, photocopy, replicate, transmit, deliver, send, mail, communicate, and convey Dow's Tyrin® CPE trade secrets in violation of Title 18, United States Code, Section 1832(a)(2); and

(c) receive and possess Dow's Tyrin® CPE trade secrets, knowing such information to have been stolen, appropriated, obtained, and converted, without authorization, in violation of Title 18, United States Code, Section 1832(a)(3).

**Manner and Means of Accomplishing the Objects of the Conspiracy**

11.     It was part of the conspiracy for **LIOU** to gather together, hire and pay employees and former employees of Dow who had worked on Dow's engineering for producing Tyrin® CPE in order to prepare a detailed CPE engineering package to sell to

5

prospective Chinese companies.  In marketing his CPE design package to the Chinese, **LIOU** emphasized that he and the other conspirators associated with Pacific Richland had at least 60 years of experience in research, design, construction, startup, and operation of chemical plants, including the world's largest and most modern producer of CPE, an apparent reference to one or more of Dow's facilities.

12.     It was part of the conspiracy for **LIOU** to propose a six-step capital management methodology to potential Chinese customers which was similar to one which had been successfully utilized by Dow to manage the design, building and startup of Dow's chemical plants.  Phases of both capital management methodologies involved the production of a process design package for a CPE manufacturing plant, which was to define the scope of detailed engineering work, and it included process index flow sheets, heat and material balances, process flow diagrams, equipment lists and specification sheets, and P&IDs, as well as a process manual, which described each step in the manufacturing process in detail.

13.     It was part of the conspiracy for **LIOU** and the other members of the conspiracy to steal, without authorization appropriate, obtain by fraud, artifice and deception, without authorization copy, duplicate, draw, photograph, download, upload, replicate, deliver, send, mail, communicate, convey, receive and possess Dow's trades secrets pertaining to Tyrin® CPE, for the purpose of producing a process design package for various Chinese companies, which combined the best aspects of the Stade and Plaquemine Tyrin® CPE manufacturing processes.  Such trade secret information included aspects of Dow's

6

process index flow sheets, its process flow diagrams, its process manual, and other engineer

designs and drawings, regarding the following:

   a.   Dow's high density polyethylene (HDPE) premix and slurry system, including
        the specifications for the physical and chemical properties of the HDPE;

   b.   Dow's surfactant (detergent wetting agent) storage and feed system used to
        create a stable HDPE and water slurry;

   c.   Dow's chlorination reaction system, including its feed manifold at the top of
        the reactor dome, the metallurgical composition of the alloy inside the reactor,
        the agitators and other components of the reactor, the chlorine injection
        system, and the chlorine scrubber;

   d.   Dow's design of the washing and acid neutralization portion of its Tyrin® CPE
        manufacture, utilizing components from each of the Dow plants at Stade and
        Plaquemine, including the metallurgical composition of the alloy in its wash
        tanks at Stade and in one of the trains at Plaquemine;

   e.   Dow's continuous drying and dewatering systems, utilizing the designs from
        each of the Dow Plaquemine and Stade plants, including the use of a belt press
        system for one Chinese company and centrifuge technology for another;

   f.   Dow's use of in-process antiblock and anti-agglomeration additives and their
        mixing systems, to avoid process system fouling and plugging, from Tyrin®
        CPE manufacture through final packaging; and

   g.   Dow's continuous fluid bed dryer and its distinctive, multiple stages of drying
        and operating parameters, including temperature levels.

   14.   It was part of the conspiracy for **LIOU** to sometimes seek to avoid currency

reporting requirements for cash payments he had received in China while seeking business

for Pacific Richland, by structuring and assisting in structuring the importation of United

States currency in amounts greater than $10,000, in that, while outside the United States, he

would divide the currency into amounts less than $10,000 and give those amounts to others to

transport into the United States for him.

7

15.    It was further part of the conspiracy for **LIOU** to arrange to receive payments for his work from the Chinese companies by letters of credit honored by the Bank of China and paid through his brother-in-law, TLW, and his brother in law's business called "DC," Ltd., located in Hong Kong.  Upon request by **LIOU**, TLW would wire transfer funds to **LIOU** and Pacific Richland from one or more bank accounts TLW maintained either in his name or that of "DC," Ltd.

16.    It was part of the conspiracy for **LIOU** to hide Stoecker's participation in the conspiracy by causing Stoecker to be paid only in cash.

17.    In order to insure Keith Stoecker's continued loyalty to **LIOU** and to keep Stoecker from revealing his participation in the theft of Dow Tyrin® CPE trade secrets, it was further part of the conspiracy for **LIOU** to hire Stoecker for additional engineering services and to continue to pay him in cash, long after Dow and DuPont Dow had uncovered the theft of the Tyrin® CPE trade secrets and had sued various members of the conspiracy in the Summer of 1999.

18.    It was further part of the conspiracy for **LIOU** to recommend several of the same subcontractors and vendors which Dow used for its Tyrin® CPE process, including a company which supplied the agitating rotors in the Dow Tyrin® CPE reactors, and other companies to supply blenders and dryers, while refusing to guarantee its engineering design to the Chinese companies if they strayed from the recommended subcontractors.

8

19.     It was further part of the conspiracy for **LIOU** to cause Wheeler to accompany him on trips, to represent to the Chinese companies that Wheeler was an expert engineer from Dow, and to call upon Wheeler to explain Dow's procedures on various aspects of the proposed CPE projects for the Chinese companies.

20.     It was further part of the conspiracy for **LIOU** to make false representations about his actions in a lawsuit filed by Dow and DuPont Dow in the Summer of 1999.

**Overt Acts in Furtherance of the Conspiracy**

21.     In furtherance of the conspiracy and to accomplish its objects, the defendant **LIOU** and his co-conspirators committed the following overt acts, among others, in the Middle District of Louisiana and elsewhere:

a.  In March and April 1996, at **LIOU's** request, Wheeler accompanied **LIOU** to China for the purpose of investigating possible business opportunities.

b.  In July 1996, Wheeler was re-hired by Dow as a one year consultant, which **LIOU** used to his advantage, since he knew Wheeler again had access to Dow Tyrin® CPE trade secret information.

c.  In September and October 1996, at the request of **LIOU**, Wheeler accompanied **LIOU** back to China, where the possibility of selling a CPE process design package was discussed with officials of a Chinese company which is referred to herein as "Q".

d.  On an exact date unknown, but in October 1996, while in China, **LIOU**, gave John Wheeler an amount of money slightly less than $10,000 in U.S. currency in order to assist **LIOU** bring an amount of U.S. currency greater than $10,000 into the United States.

e.  On or about December 2, 1996, through his company, Pacific Richland, **DAVID W. LIOU** began to make periodic payments to Wheeler, through his company, John W. Wheeler Consulting, Inc., for Wheeler's engineering work in designing the CPE process design package to attempt to sell to the Chinese companies.

9

f.     On an exact date unknown, but on or before December 18, 1996, with the concurrence of **LIOU**, Wheeler requested HM to send him copies of the Stade Tyrin® CPE reactor engineering drawings in order to assist him prepare a CPE process design package to sell to Chinese companies.

g.     In March 1997, at the request of **LIOU**, Wheeler accompanied **LIOU** back to China, where the possibility of selling a CPE process design package was discussed with officials of a Chinese company, referred to herein as "H".

h.     On or about April 15, 1997, **LIOU** wrote additional data on a process index flow sheet prepared in connection with the "Q" project.

i.     On or about July 8, 1997, **LIOU** received $9,980, sent from his brother-in-law in Hong Kong.

j.     On or about July 24, 1997, **LIOU** received $19,985, sent from his brother-in-law in Hong Kong.

k.     On or about August 1, 1997, after another trip by **LIOU** and Wheeler to China, **LIOU** entered into a contractual arrangement with "H" to produce technology, which included a CPE process design package.

l.     On or about September 4, 1997, **LIOU** received $39,980, sent from his brother-in-law in Hong Kong.

m.     Between on or about September 21, 1997, and October 10, 1997, HM worked at Pacific Richland's business office in Baton Rouge, Louisiana, in order to perform detailed engineering work for **LIOU**, Wheeler, and Chinese engineers associated with the Chinese projects.  **LIOU** paid HM for his work.

n.     On or about October 6, 1997, **LIOU** received $19,980, sent from his brother-in-law in Hong Kong.

o.     On or about October 28, 1997, **LIOU** received $19,985, sent from his brother-in-law in Hong Kong.

p.     On an exact date unknown, but by November 30, 1997, Stoecker had copied Dow's Tyrin® CPE process manual and created a version of it for the "Q" project.

q.     On or about January 2, 1998, **LIOU** received $49,985, sent from his brother-in-law in Hong Kong.

10

r.     On or about January 8, 1998, **LIOU**, Wheeler, Stoecker, HM, another retired employee of Dow, and a number of Chinese representatives from "Q" met and ate dinner at a Baton Rouge restaurant.

s.     Between on or about January 9 and January 12, 1998, **LIOU**, Wheeler, HM, and "Q" representatives met in Houston, Texas, where they discussed the Pacific Richland-proposed CPE engineering design. During discussions, the "Q" representatives expressed preference for Dow's newer, centrifuge technology over the slide screen proposal for dewatering and drying. HM was asked to provide additional, detailed engineering for a centrifuge.

t.     On or about January 14, 1998, **LIOU** made a second payment to HM for his detailed engineering work on the CPE China projects.

u.     In or about February 1998, HM mailed back to Wheeler certain engineering materials, including P&IDs, which HM had drafted, to be incorporated into the Pacific Richland design packages for the Chinese companies, along with a study for substituting centrifuge for slide screen technology.

v.     On or about February 12, 1998, **LIOU** caused a number of technical documents to be shipped from Pacific Richland to "H", including P&IDs and a process flow diagram.

w.     On or about March 3, 1998, **LIOU** caused a process manual to be shipped from Pacific Richland to "H".

x.     On or about April 3, 1998, **LIOU** received $69,985, sent from his brother-in-law in Hong Kong.

y.     On or about April 23, 1998, while in China, **LIOU** gave Wheeler approximately $5,000 in U.S. currency in order to assist **LIOU** bring an amount of U.S. currency greater than $10,000 into the United States.

z.     On an unknown date in May 1998, **LIOU** gave an envelope with cash to HM's son, in order to complete payments to HM.

aa.     On or about June 8, 1998, **LIOU** received $29,985, sent from his brother-in-law in Hong Kong.

bb.   In about August and September 1998, **LIOU** told the local Baton Rouge representative of the manufacturer of the agitators used in Dow's CPE plants that Pacific Richland would not guaranty its work for "H" if a competitor's agitator was used.

cc.   On or about September 10, 1998, **LIOU** received $29,985, sent from his brother-in-law in Hong Kong.

dd.   On or about November 12, 1998, **LIOU** received $19,985, sent from his brother-in-law in Hong Kong.

ee.   On or about November 30, 1998, both **LIOU** and Wheeler wrote notes on a copy of the "Q" reactor drawing.

ff.   On or about January 11, 1999, **LIOU** received $49,985, sent from his brother-in-law in Hong Kong.

gg.   Between January 23, 1999 and April 20, 1999, **LIOU** wrote three checks totaling $20,000 from the Pacific Richland bank account, to a small business, referred to herein as "BBSE, Inc.," run by another retired employee of Dow, in order to pay for Dow slide screen filter technology, which the retired employee was providing to **LIOU**, and which **LIOU** was providing to the Chinese companies for their CPE projects.

hh.   In February and March 1999, **LIOU** and Wheeler traveled to China again to meet with "Q" representatives.

ii.   On or about March 25, 1999, HM prepared short answers to Wheeler about some technical questions raised by Wheeler, regarding one of the Chinese CPE projects.

jj.   Some time in the Spring of 1999, **LIOU** agreed with Stoecker and Wheeler to attempt to cause references to the "H" and "Q" projects to be erased from the Pacific Richland computers.

kk.   On or about April 12, 1999, **LIOU** received $79,985, sent from his brother-in-law in Hong Kong.

ll.   On or about July 7, 1999, **LIOU** received $58,685, sent from his brother-in-law in Hong Kong.

mm.    On or about August 13, 1999, in a sworn deposition in the civil lawsuit filed by Dow and DuPont Dow against him and others, **LIOU** falsely denied knowing the retired employee mentioned in paragraph gg., who had produced the Dow slide screen technology, and falsely denied paying him.

nn.    On or about August 13, 1999, in the sworn deposition mentioned in paragraph nn. above, **LIOU** falsely denied paying cash to Stoecker and falsely denied knowing Stoecker produced the CPE process manual used for the "Q" and "H" design packages.

oo.    On or about August 14, 1999, in the same deposition, **LIOU** repeated his lie about not having paid Stoecker for having produced the CPE process manual which **LIOU** had incorporated in the Chinese design packages.

pp.    On or about August 14, 1999, in the same deposition, **LIOU** falsely testified that he gave no one permission to remove data from the Pacific Richland computers.

qq.    In November 1999, **LIOU** traveled to China and paid for Stoecker to travel to China.

rr.    Beginning with the filing of the civil law suit by Dow and DuPont Dow in the Summer of 1999 and continuing until several years thereafter, **LIOU** paid Stoecker several thousand dollars a month for engineering services on various Chinese projects and to keep him from revealing his participation in the theft of Dow Tyrin® CPE trade secrets.

ss.    On or about October 31, 2001, **LIOU** wrote to an American chemical company, proposing "H" produced CPE as a "direct, drop in substitute for CPE resins made by DuPont Dow Elastomers."

The above is a violation of Title 18, United States Code, Section 1832(a)(5).

## COUNT TWO - RECEIPT AND POSSESSION OF STOLEN TRADE SECRETS

22.    The allegations set forth in Paragraphs 1 through 9, concerning the Dow Tyrin® CPE product and the principal participants involved, and the Manner and Means of Accomplishing the Objects of the Conspiracy, set forth in Paragraphs 11 through 20, are hereby incorporated as if fully set forth herein.

13

23.    Between on or about November 5, 1997 and on or about July 7, 1999, in the Middle District of Louisiana, the defendant, **DAVID W. LIOU,** did knowingly receive and possess without authorization of the owner, Dow, certain trade secrets, namely those items enumerated in Paragraphs 13a through 13g, which are set forth and contained in varying degrees of detail in Dow's process index flow sheets, Dow's process flow diagrams, P&IDs, engineering drawings, the Dow process manual, and correspondence, all of which were related to Dow Tyrin® CPE, which product was produced for and placed in interstate and foreign commerce. The defendant **LIOU** knew the trade secrets had been stolen, obtained, and converted without authorization, he intended to convert the trade secrets to the economic benefit of someone other than Dow, and intended and knew that such receipt and possession would injure Dow.

The above is a violation of Title 18, United States Code, Sections 1832(a)(3) and 2.

## COUNTS THREE THROUGH TEN - WIRE FRAUD

**Background**

24.    The allegations set forth in Paragraphs 1 through 9, concerning the Dow Tyrin® CPE product and the principal participants involved, and the allegations set forth in Paragraphs 11 through 20, concerning the Manner and Means of Accomplishing the Objects of the Conspiracy, are hereby incorporated as if fully set forth herein.

**The Scheme to Defraud**

25.    From an unknown date in 1996, and continuing to at least October 31, 2001, in the Middle District of Louisiana and elsewhere, defendant **DAVID W. LIOU** devised and

14

intended to devise a scheme and artifice to defraud and to obtain money by means of

materially false and fraudulent pretenses and representations.

26.    It was part of the scheme to defraud for **LIOU** to attempt to sell CPE design

packages to companies in China in violation of his employment and retirement agreements

with Dow that he would not reveal trade secrets and confidential information he had acquired

while employed by Dow, except upon written consent by Dow.

**The Wirings**

27.    On or about the dates listed below, in the Middle District of Louisiana and

elsewhere, for the purpose of executing the above-described scheme and artifice to defraud,

and to obtain money by means of materially false pretenses, representations, and promises,

the defendant, **DAVID W. LIOU**, did knowingly cause to be transmitted by means of wire

communications in interstate and foreign commerce, certain writings, signs, signals, and

pictures, that is, wire transfers in the following amounts from accounts TLW maintained at

the CITIC Ka Wah Bank Limited in Hong Kong to the Pacific Richland account maintained

by **LIOU** at Hibernia National Bank in Baton Rouge, Louisiana:

| COUNT | DATE | ITEM |
|-------|------|------|
| **THREE** | January 2, 1998 | $49,985 |
| **FOUR** | April 3, 1998 | $69,985 |
| **FIVE** | June 8, 1998 | $29,985 |
| **SIX** | September 10, 1998 | $29,985 |
| **SEVEN** | November 12, 1998 | $19,985 |

15

| COUNT | DATE | ITEM |
|-------|------|------|
| **EIGHT** | January 11, 1999 | $49,985 |
| **NINE** | April 12, 1999 | $79,985 |
| **TEN** | July 7, 1999 | $58,685 |

Each of the above is a violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS ELEVEN THROUGH THIRTEEN
## ILLEGAL MONETARY TRANSACTIONS

28.    On or about the dates set forth below, in the Middle District of Louisiana, the defendant, **DAVID W. LIOU**, knowingly engaged in, attempted to engage in, and caused the following monetary transactions, by, through, and to financial institutions affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343:

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| **ELEVEN** | January 14, 1998 | Check for $16,312.89 drawn upon Pacific Richland Products, Inc. bank account No. 729076335, Hibernia National Bank, Baton Rouge, Louisiana, made payable to HM. |
| **TWELVE** | April 7, 1998 | Check for $36,000, drawn upon Pacific Richland Products, Inc. bank account No. 729076335, Hibernia National Bank, Baton Rouge, Louisiana, made payable to John Wheeler. |

16

| **COUNT** | **DATE** | **MONETARY TRANSACTION** |
|---|---|---|
| **THIRTEEN** | April 20, 1999 | Check for $15,000, drawn upon Pacific Richland Products, Inc. bank account No. 729076335, Hibernia National Bank, Baton Rouge, Louisiana, made payable to BBSE, Inc. |

Each of the above is a violation of Title 18, United States Code, Sections 1957 and 2.

## COUNTS FOURTEEN AND FIFTEEN - PERJURY

**Background**

29.     On July 1, 1999, a lawsuit was filed in the United States District Court for the Middle District of Louisiana captioned, *Dow Chemical Company and duPont Dow Elastomers, LLC v. Wen-Chyu Liou, et al.,* Civil Action No. 99-544-C-M3. That lawsuit was eventually consolidated with another captioned *Keith Stoecker v. Dow Chemical Company, DuPont Dow Elastomers, L.L.C., et al.,* Civil Action No. 99-781-C-M3, filed on September 20, 1999. The consolidated lawsuits are hereinafter referred to as "the lawsuit."

30.     On January 16 and 17, 2001, **LIOU's** deposition was taken for purposes of the lawsuit in Baton Rouge, Louisiana. During that sworn testimony, it was material for the lawyers of Dow and DuPont Dow to determine **LIOU's** knowledge of Stoecker's trip to China in 1999, including the source of funds which paid for the trip, taken after the lawsuit had been filed, and after **LIOU** and other defendants had been ordered by the Court not to reveal any trade secrets concerning Dow Tyrin® CPE. It was also material for Dow's lawyers to learn the truth about the relationship between **LIOU** and the retired German engineer, HM.

**The Perjuries:**

## COUNT FOURTEEN

31.    During the deposition on January 16, 2001, being under oath and having been duly sworn to tell the truth, **DAVID W. LIOU** did knowingly make the below listed, underlined false material declarations as follows:

**Transcript, pages 67-68**

[Mr. Eades Hogue, all questions]

> Q.    You did not take a trip with Mr. Stoecker?

[Mr. David Liou, all answers]

> A    That's correct.
>
> Q.    Did you in any way assist him in arranging for his travel to China?
>
> A.    <u>I did not</u>.
>
> Q.    Did you in any way or manner arrange for his tickets and the accommodations, travel to China to be paid for?  (Liou's counsel objects)
>
> A.    <u>I did not</u>.
>
> Q.    You did not.  Did your wife arrange, in any way, for the payment of Mr. Stoecker's travel expenses or airline tickets or anything of the sort? (Liou's counsel objects)
>
> Q.    Did your wife?
>
> A.    <u>Not according to my knowledge.</u>
>
> Q.    Not according to your knowledge?
>
> A.    <u>She did not.</u>

18

Q.     She did not?

A.     Unless you ask her herself.

Q.     Are you aware if she did?

A.     I'm not aware.

**Transcript, pages 70-71**

Q.     All right.  Do you know whether Mr. Stoecker has ever utilized the Gateway Travel to take any trips to China or any other locations outside the United States?

A.     I don't know.

Q.     You don't know that?

A.     I don't know that.

Q.     Do you know how Mr. Stoecker would have paid for any travel costs or expenses, including airline tickets, for any travel that he took to mainland China?  (Objection by Liou's counsel)

Q.     Do you know that?  Do you know what--

A.     You'll have to ask him.  Sorry, I don't know anything about it.

Q.     You don't know anything about it?

A.     That's correct.

**Transcript, pages 78-79**

Q.     Isn't it true that Mr. Stoecker was in China at the same time you were in either November and December of 1999?  (Objection by Liou's counsel)

[By Mr. Hogue]     Okay.

Q.     Well can you answer your counsel's question?

19

A. <u>I have no idea whether he went to China.  I have no idea.</u>

Q. Well, do you know whether he went to China?

A. <u>I didn't know.</u>

32. The above testimony of **LIOU**, as he then and there well knew and believed was false, in that **LIOU** knew that he had arranged for Stoecker to travel to the People's Republic of China in late November 1999 for the purpose of meeting with representatives of a third chemical company in China, which was interested in competing with Dow by designing and building a new CPE plant and exporting their own CPE to the United States. **LIOU** well knew he had arranged for the cost of Stoecker's airline tickets to be paid to U.S.A. Gateway Travel in Texas with a check drawn by a co-worker of **LIOU's** spouse, and he knew he had then arranged to reimburse the co-worker.

## COUNT FIFTEEN

33. During the deposition on January 17, 2001, being under oath and having been duly sworn to tell the truth, **DAVID W. LIOU** did knowingly make the below listed, underlined false material declarations as follows:

### Transcript, page 455

[Mr. Eades Hogue, all questions]

Q. Do you remember an individual named Mr. [HM]?

[Mr. David Liou, all answers]

A. <u>Yeah, barely, yes.</u>

20

**Transcript, page 456-457**

Q.    All right.  Do you remember approximately when you first met him?

A.    I don't remember.  It's been several years ago, yes.

Q.    Would it have been in the latter part of 1997; does that refresh you, approximately?

A.    Approximately.

Q.    October?

A.    Yeah, a possibility.

Q.    What did you and Mr. [M] discuss on this occasion?

A.    I just said hello to him and introduced to me and I didn't discuss anything.

Q.    You didn't--

A.    I don't even know him.

**Transcript, page 458**

Q.    Did you have any discussions at any time with Mr. [M] about any of the process design package documents that you were preparing--

A.    No.

Q.    –for ["H"] or ["Q"]?

A.    I did not discuss with him anything because that was Wheeler's job.

34.    The above testimony of **DAVID W. LIOU**, as he then and there well knew and believed was false, in that **LIOU** worked closely with HM on the CPE project, **LIOU**

had paid him for his work, and **LIOU** had had discussions with HM about various aspects of the CPE design packages being prepared to present to the Chinese companies.

Each of the above is a violation of Title 18, United States Code, Section 1623.

## FORFEITURE ALLEGATIONS

35.    As a result of the offenses alleged in Counts One (Conspiracy in violation of Title 18, United States Code, Section 1832(a)(5)) and Two (Receipt and Possession of Stolen Trade Secrets in violation of Title 18, United States Code, Section 1832(a)(3)), **DAVID W. LIOU** shall forfeit to the United States:

      a.    Any property constituting, or derived from, any proceeds **LIOU** obtained directly or indirectly as the result of such violations; and

      b.    Any of **LIOU**'s property used and intended to be used, in any manner or part, to commit or facilitate the commission of such violations, if the court, in its discretion so determines, taking into consideration the nature, scope, and proportionality of the use of the property in the offenses.

36.    Property subject to forfeiture, any seizure and disposition thereof, and any administrative or judicial proceeding in relation thereto, shall be governed by Title 21, United States Code, Section 853, except for subsections (d) and (j).

37.    If any property constituting or derived from proceeds of such offenses, as a result of any act or omission of the defendant:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third party;

      c.    has been placed beyond the jurisdiction of the court;

      d.    has been substantially diminished in value; or

e.     has been commingled with any other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 1834, to seek forfeiture of any other property of the defendant up to the value of the property constituting or derived from proceeds of such offenses.

The above is a violation of Title 18, United States Code, Section 1834.

UNITED STATES OF AMERICA, by

**A TRUE BILL**

_____
DAVID R. DUGAS
UNITED STATES ATTORNEY
MIDDLE DISTRICT OF LOUISIANA

_____
GRAND JURY FOREPERSON

_____
COREY R. AMUNDSON
ASSISTANT U.S. ATTORNEY

_____
DATE

_____
IAN F. HIPWELL
ASSISTANT U.S. ATTORNEY

# Criminal Cover Sheet

**U.S. District Court**

**Place of Offense:**

City            Baton Rouge

County/Parish   East Baton Rouge

**Matter to be sealed:**   <u>X - No</u>     Yes

**Related Case Information:**

**Superseding Indictment**  <u>X</u>  **Docket Number** <u>05-85-RET-CN</u>
Same Defendant   <u>X</u>     New Defendant _____
Magistrate Case Number _____
Search Warrant Case No. _____
R 20/ R 40 from District of _____
**Any Other Related Cases:**
<u>U.S. John W. Wheeler Cr. No.:04-09-RET-DLD;</u>
<u>Dow Chemical Company, et al v. Wen-Chyu, et al, Civil Case No.: 99-544-RET;</u>
<u>Keith Stoecker  v. Dow Chemical, et al, Civil Case No. 99-781-RET; and</u>
<u>United States v. Keith Stoecker, Cr.No. 05-22-RET-SCR</u>

**Defendant Information:**
Defendant Name   **Wen Chyu Liu**
Alias           David W. Liou

Birthdate        SS #      Sex   Male      Race   White     Nationality

**U.S. Attorney Information:**
AUSA Ian F. Hipwell                  Bar #   6947

**Interpreter:** X No  ☐ Yes     **List language and/or dialect:** _____

**Location Status:**

Arrest Date _____
_____     Already in Federal Custody as of   _____
_____     Already in State Custody
_____     On Pretrial Release

**U.S.C. Citations**

**Total # of Counts:**    <u>15</u>     ☐ Petty     ☐ Misdemeanor     **x** Felony

| | Index Key/Code | Description of Offense Charged | Count(s) |
|---|---|---|---|
| set 1 | 18 U.S.C. § 1832(a)(5) | Conspiracy, Receipt and Possession of Stolen Trade Secrets | 1 |
| set 2 | 18 U.S.C. § 1832(a)(3) | Receipt and Possession of Stolen Trade Secrets | 2 |
| set 3 | 18 U.S.C. § 1343 | Wire Fraud | 3-10 |
| set 4 | 18 U.S.C. § 1957 | Illegal Monetary Transaction | 11-13 |

## U.S.C. CITATIONS (continued)

| | INDEX KEY/CODE | Description of Offense Charged | COUNT(S) |
|---|---|---|---|
| set 5 | 18 U.S.C. § 1623 | Perjury | **14-15** |
| set 6 | 18 U.S.C. § 1834 | Forfeiture | |

**Date:** July 10, 2008          **Signature of AUSA:** _____

**District Court Case Number (To be filled in by deputy clerk):** _____